Good morning. We will be hearing one case this morning on Spivack v. City of Philadelphia and Lawrence Krasner and we will start with Ms. Patterson. May I please report Leah Patterson for the appellant Rachel Spivack. I would like to request three minutes for rebuttal if I may. Granted. In this free exercise clause case the defendant district attorney fired Rachel from her job as an assistant DA after refusing to accommodate her orthodox Jewish religious beliefs which prohibit her from receiving any vaccines. The district court erred in granting summary judgment for the defendant and instead summary judgment for the plaintiff is appropriate because even if the defendant's unwritten practice of denying all religious accommodation requests is the office's final policy, that policy triggers strict scrutiny in Counsel, help me understand something. In terms of what's before us, the district court made the determination that this was generally applicable in a neutral policy and as a result rational basis review would apply. Are you asking us to on appeal or is the question whether we should remand for a jury to make the determination not only of the application of that standard but a jury to make the determination about whether the facts support a strict scrutiny standard? We primarily argue that the first, Your Honor, that the summary judgment standard warrants strict scrutiny of what the defendant's policy was. In the alternative we would ask for remand for trial if the court determines that summary judgment for the plaintiff would not be warranted. And would that remand be for a fact finder to make determinations that inform the standard of review as well as the application of that standard to the facts? Yes, in the alternative that would be our argument because if the defendants, what the district court called the second policy, if that second policy does not trigger strict scrutiny then there are questions of fact that become material at that point and would warrant a fact finding for trial. But our argument is, of course, that that policy, even if you take it as a second policy, that it does trigger strict scrutiny and fails it as a matter of summary judgment standard. And how would this work in practice? Say you persuaded us that there was at least a genuine dispute of material fact as to certain fundamentals like which policy was in play. I imagine as counsel that that opening argument in any trial you would want to know already what the standard of review is. Well, it depends if the standard of review is impacted by those facts. Given that the standard of review is dependent on whether the rule is neutral and generally applicable, what the rule is and the facts that go to what makes it neutral or generally applicable or not would be relevant for a jury to determine. So in that case, the standard of scrutiny that the policy is held to would be dependent on certain facts that would be determined at a trial at that point. And would that be done by bifurcating the trial into the standard of review and its application? I suppose it could be done that way, Your Honor. The application of strict scrutiny is essentially a matter of law once the facts are determined. Thank you. The defendant's second policy, as the district court calls it, the unwritten practice of denying all religious accommodations fails to be neutral and generally applicable for several reasons, all of which are independent of each other to trigger strict scrutiny. The first among those is that the practice reflects a broad amount of discretion, which under cases like Fulton, Blackhawk, and Tenafly will trigger strict scrutiny because of the breadth of the discretion to consider essentially any accommodation or exemption request. Is there any genuine dispute as to a categorical denial of religious exemptions after January of 22? The question of the district court found that it was a categorical policy, but the difference between a categorical policy and a policy of individual discretion is that the criteria for a categorical policy are usually promulgated in advance and limit the decision maker's discretion. In this case, there were no criteria. The defendant specifically did not articulate any criteria and explained his rationales for making the decisions in very individualized terms based on what accommodations he found to be persuasive, what he found to be unpersuasive. But isn't that because as of January, he had determined that across the board, those requests would be denied? Why is there a need to articulate anything further about when discretion would be exercised? He testifies he adopted a policy, it would not be exercised at all. For purposes of Fulton, what matters is the scope of his discretion at the time, and the articulation of his rationale afterwards does not limit that discretion. I would point the court to the defendant's testimony at page 301 of the record, where he explains that in retrospect, he would have considered granting the plaintiff an accommodation even though what he describes as his policy would not provide for that. And so it's that ability to grant exemptions, whether the policy provides for it or not, that constitutes discretion under Fulton. But even if it is a categorical system of exemptions, it still triggers strict scrutiny because it treats comparable secular conduct more favorably than religious activity of the plaintiff. The comparability of such activity is judged under Tandon and Diocese of Brooklyn with respect to the risk at issue, not the reason why the particular action is taken. The exemptions for both medical and union employees are comparable to the religious objectors because they're all engaging in the same conduct. Well, if he had no authority to require the vaccination of the union employees and couldn't hire or fire them or punish them for not getting vaccinations, how can we use that as a comparator? Because the question under Tandon is with respect to implication on risk, not with respect to control. And the best case for this is Fraternal Order of Police, where the court rejected the argument that a medical exemption was not comparable to religious objections because, as the city argued, the medical exemption was required by the ADA. And just because the exemption was required by an obligation to outside law did not mean that those employees were not similarly situated. By the same token, the defendant, of course, is obligated to follow the collective bargaining agreements, but they're still comparators because it will trigger his other obligations to treat these employees similarly in that they are in similar situations. So that is why the union members are still comparable. And it's- I'm not sure I follow. How does he have any authority to do that? Where is there anything in the record indicating that that's a genuine disputed fact? Forgive me, Your Honor. Authority with respect to- Well, he was not able to mandate vaccinations for unionized employees, but because they were in his office as run-of-the-mill employees interacting with everyone else, they implicated his risk, and he was obligated to not ignore them and ignore the risk that they presented. Because the exemption, the union member's exemption, stems from an obligation to the collective bargaining agreements. But the question of control goes to what he could do to ensure equal treatment for his employees. But if he doesn't have authority to make- to require that of this category of employees, how is that- how is that a group similarly situated? How is that a relevant comparator? Well, he did have authority to provide similar exemptions to the non-unionized members of his staff. And they're similarly situated because they're in the same office presenting the same risk of spreading COVID. I would point to, in Fraternal Order of Police, the key distinction between the undercover officers that did not implicate the interest issue there was that their employment role was something completely different, such that the- whatever the reason for being on- being bearded, the- they did not implicate the interest in uniformity. So there was an actual difference of situation between the employees. And unionization status is not something that goes to the risk of spreading COVID in his office. In your view, what is the risk that the DA's office has stated for its policy? It's the risk of spreading COVID-19 and the operational impacts that come from COVID-19 in the workplace. And that's reflected in the defendant's declaration. So it seems that there are two or maybe even three interests that were stated in the record. There was one, you know, I don't want my staff, you know, this is- I'm speaking in the voice of Mr. O'Krasner. He essentially said he didn't want his staff to get sick and possibly die. He said the interest also is not spreading COVID to the public and, you know, court staff and, you know, criminal defendants and victims' families and so on. And then- and then I guess I'm not recalling what the third is, but like, would it matter for whether we're considering medical exemptions versus religious exemptions? Would it matter if, you know, would the difference between those two interests matter? I don't think so, Your Honor, because the consistent statements in the record are that the defendant was focused on preventing the spread of COVID-19 and those operational impacts. And I would point to the First Circuit's Lowe v. Mills case, which emphasizes that any unvaccinated person in the workplace presents a threat to those interests. And the defendant and his staff admitted that that was the case, that anyone who was unvaccinated in the workplace would implicate those interests. And so treating them differently because of their reason for being unvaccinated is the kind of value judgment that will trigger strict scrutiny. Well, to pick up on Judge Friedman's question, one of the goals is at Appendix 51, and it says to maintain a safe and healthy workplace in light of the COVID-19 pandemic. Why don't medical exemptions at least arguably help to maintain a safe and healthy workspace by ensuring that all employees can work in a safe space? That is, if you are granting an exemption for someone with a medical, if you're granting a medical exemption, it is because the vaccine would actually injure, would be detrimental to the safe safety and health of that particular person. Why isn't that a distinguishing factor? My time is about to expire, may I answer? Yes. The reason is because it's essentially it's another way of saying that the medical exemption was that the defendant kind of persuasive that there was a good reason for her to be exempted because of her medical situation. But once the similar reason to how grocery stores were, no one would argue that they weren't essential. But once the question determined is turning on essentiality or the medical exemption, then that is something that will trigger a strict scrutiny. Counselor, you're running out of time now, but again, consistent with the question, a couple of the interests that were articulated do seem to affect those who are medically vulnerable differently. One of them, if I recall correctly, dealt with specifically protecting those employees who were medically vulnerable. And another was the, as Judge Freeman referenced, continuing with operations, meaning that people would not have to be out of work. But if you're dealing with someone who, as a result of their medical condition, would be particularly vulnerable and would have to be out of work because of taking the vaccination, why doesn't that implicate those two interests differently than it would for someone claiming a religious exemption? The First Circuit's Low v. Mills case addressed both of those questions. And I would point to that and the idea that excluding all of the unvaccinated people from the workplace would accomplish those goals even better than allowing some exemptions while disallowing others. So at the end of the day, they all go to that spread of COVID. And removing all of the people who are unvaccinated from the workplace would even better protect those interests and mitigate the possibility of operational impact. In the same way, allowing religious exemptions would provide more employees in the office who can work, and that would also tend to go to that interest of maintaining operations. The First Circuit decision was in the posture of dealing with a motion to dismiss, and it gave lots of caveats about what might develop with a record. Why aren't we more in the posture of the Second Circuit and we the people that made the determination that these two groups were not comparable? My recollection of We the Patriots v. Hochul is that it was in a preliminary injunction posture like Doe v. Mills was. It's my recollection. The MTD posture that the Low v. Mills case was in is more analogous to this case. And the only difference is that we do have a developed record here. And the record supports the idea that these are comparable employees that go to the risk. So that record has been developed. But otherwise, the law is not different between the two. When we're trying to figure out which rationale we look to, do we look to contemporaneous statements or do we look to these sort of post hoc rationales that we see in, for example, maybe some of the deposition testimony? We tend to look to contemporaneous evidence. Yes. And I have just a factual question about the union workers that you were talking about before. Are those employees or are those people who are employed by other departments like the police department or something else? Yes, that's correct. The second. I'm sorry. Are they employees or are they employed by other entities like the police department or something? They all are city employees. So that is the ultimate employer is the city. They work in the district attorney's office and the unionized employees are a fraternal order of police and the clerk civil service union as well. But in terms of their employee status, they are have the same the answer to the city and as do those who would be claiming a religious exemption, non-unionized employees within the DA's office. I'm sorry, I don't understand the question. When you're saying that they are all city employees, are the non-unionized employees in the district attorney's office the same status as employees other than one group being unionized and one non-unionized? To my understanding, yes, that's correct. I want to just go back for a second. You had made reference to that portion of the testimony where DA Krasner talks about how he would have granted the accommodation for remote work. And is that the only evidence in terms of deciding as a matter of law that he was exercising or had the opportunity to exercise discretion on a case by case basis, even assuming there was a, the January policy was extant as a categorical treatment of denials for religious exemptions? I'd say that that's the best evidence. It's not the only evidence. The trend of the defendant's testimony is to discuss his level of discretion to decide these exemptions for any reason. He also testified that he would tend to accept any argument that someone might make to receive an exemption. And what would determine the outcome is whether he found them to be persuasive or not. And the several good examples of that are at 278 and 288 in the record, where he's discussing that these are, the factors he would consider are entirely individually specific. And that tends to be the hallmark of a discretionary policy. You don't seem to be arguing on appeal that the January 22 policy would fail rational basis review. No, we're not arguing that on appeal. You concede that it would satisfy rational basis review if that were applicable? Yes. I want to go back to your questions about your statement about. I think it was that Appendix 301, but maybe it's a little bit earlier. Basically, you know, D.A. Krasner says we would have, you know, saying we would have considered this as an accommodation. If you continue to read and you get to somewhere around Appendix 306, it says, you know, there's a discussion about considering the remote work. And he says that was not an accommodation. That was a decision about a way to resolve litigation. It would never have, it would never have included granting the religious exemption. So I'm trying to figure out, if we're at a motion for summary judgment phase, how is that not a material dispute of fact? Well, it entirely could be a material dispute of fact, which would warrant remand rather than summary judgment for the defendant. But in our argument is that that he was referring to two different things and he's referring to the settlement negotiations. But at 301, he's speaking in a distinctly past tense way. And there are other statements, I believe at 287 or 295, where he's discussing how he should have offered her remote work even without her requesting it at the time. And that discussion of what he understood his authority to be at the time is where the indication of discretion is, not the discussion of later settlement negotiations. You said 286? Is that what you said? I believe so. I believe so. Let me double-check. Maybe you can point us to the particular pages on the bundle. 295, actually. Sorry. 290? 295. Thank you. The Court has no further questions. Okay. Thank you. Thank you. We'll hear now from Mr. Smith. Good morning, Your Honors. May it please the Court. My name is David Smith. I represent the defendant, Epple Lee, Lawrence Krasner. Mr. Smith, perhaps you could start off where we left off. with your colleague, and that is, given that Mr. Krasner testified that despite the existence of some danger that he, quote, would have granted, close quote, the remote work option if she had requested it, how does that not indicate that contemporaneously with his decision as to Ms. Spivak that he was exercising discretion on a case-by-case basis? Well, number one, that is in the context of a Rule 408 settlement offer, settlement of litigation, where during the pendency of litigation, he offered her remote, fully remote work, which she turned down. It was a job writing briefs, working on appeals, which she analogized to cleaning toilets and said that's not anything she would ever do. I understand that that's, you know, as to the settlement offer and the questions about whether that should even be considered, let's set that aside. But this language at Appendix 301, at least for the first paragraph, does seem to be in speaking in the past tense, not about how he was treating, you know, post-litigation, that offer. But if she had requested to be, to work remotely, so she would not, because of her decision not to vaccinate, she would not be placing others in significant danger, then despite the inconvenience and despite the existence of some danger due to the necessity of transferring documents from time to time, that is something that would have been seriously considered in retrospect. That is something that we would have granted. Sure. Two points, Your Honor. The first is that in the next page or the page after that, he says categorically, there were no religious exemptions. I was not going to give any religious exemptions. And so to allow her to work remotely, as at the time the appeals division, the law division of the district attorney was working, would not have been an exercise of discretion with respect to a religious exemption. What would it have been, then? It would have been simply a decision to permit an employee to work full-time remotely during the COVID pandemic. But in this case, wouldn't the only reason to consider that be, as he says in his testimony, work remotely because of her decision not to vaccinate? Yes, because of her decision not to vaccinate, but not because of her religious beliefs. And the second point, Your Honor, is we are looking at what happened on the ground. What was the policy and how was that policy implemented at the time of the decisions? When he categorically denied all religious claims for religious exemption and without a great deal of discretion, with a very narrow criteria, granted one, only one medical exemption where there was a certification from a doctor that it would put that one person's life at risk to become vaccinated. I want to make sure I understand what you're saying. So the district attorney retained discretion on a case-by-case basis to allow for remote work. That was not a discretion that existed or was acted upon at the time the decisions were made. What we're looking at is somebody taking a deposition some substantial time later, saying on reflection, maybe I would have done it differently. But that's not what happened. That's not the discretion that was retained. But that's also not what he said. Well, I understand it's not what he said. It's not what he said some considerable time later in the middle of litigation, after having adopted a rigid policy allowing only one exemption, which was life-threatening for one person, and did not consider at all any religious exemptions at the time. His after-the-fact commentary, after he had tried and failed to settle with the plaintiff, I don't think is evidence of what was happening at the time. In any event, it would be protected by Rule 408 and would not be proper evidence. Well, we, of necessity, use testimony after the fact to try to ascertain what happened, you know, historically in a case for the prior effect to make that sort of assessment. And before us, we have to determine whether there's a genuine dispute of material fact as to whether he had discretion, even after January of 2002, to make individual determinations about, for example, whether to work remotely. What are we to do with his statement that is in the past tense and is not equivocating with, you know, I maybe would have done this? He's simply saying that despite the existence of some danger, we would have granted a request for remote work. Well, fully remote work would not involve any danger. That's number one. Number two, I don't think that that testimony is probative. It's speculative testimony inconsistent with what actually was done at the time. What was done at the time was no consideration whatsoever of claims for religious exemption and a very narrow objective standard to grant one medical exemption, which to follow up on a question I think Judge Freeman asked, that the decision to grant that one medical exemption is supportive of and not inconsistent with the policy of protecting the lives of staff and the family of staffs. This one medically compromised individual who was given a medical exemption was in a position of by necessity being very, very scrupulous in avoiding contact because COVID itself, as he testified, could also put her life at risk. So we have one exception in the entire office and that one exception is for a purpose that is consistent with the policy, unlike the FOP case where the exceptions were inconsistent with the policy. But the district attorney also said that one of the purposes of the policy was to protect the public. Yes. So how did allowing that medical exemption for that one person who presumably was still coming into the office and interacting with people, how did that further his interest in protecting the public? Well, actually there's no evidence that that person was interacting or in court, but that was a person who was double masking according to the testimony and maintaining a distance. And if this court decides to go down the strict scrutiny route, and by the way, the court did decide as a backup decision that this also satisfied strict scrutiny. And the DA Krasner testified that he went down this checklist of what were the alternatives and one of the alternatives was testing and he found that testing was after the fact and ineffective and with long delays, so it was not an adequate means. The other was masking and he testified to the experience that we all had back then. You'd walk into a store and people would be wearing masks and they'd be below their noses or even on their chins. This one person who was granted a medical exemption had an absolute need to make sure that she was wearing, that that person was wearing a mask properly because not wearing it properly was life-threatening. Does the record say if that person had any interactions with the public, even outside of court, say at the jails or by meeting with individuals in the DA's office who were not employed there? There's nothing in the record on that. But this person was not permitted to work from home, correct? Fully and remotely. That is also not in the record. So I understand your position is that the policy was the unwritten policy of no religious exemptions, but why do we not have a dispute of material facts given that Mr. Listonby said otherwise? Mr. Listonby was involved in the preparation of the written policy that was superseded by DA Krasner when he decided not to consider any request for religious exemptions. His testimony, I think, is reasonably clear that he had no involvement in the actual decision-making process that was solely DA Krasner who decided on his own, or the research of those who were advising him, not that he did not need to consider religious exemptions and did not. Well, I recall his testimony being that Mr. Krasner took all of the religious exemption applications home over the weekend and reviewed them and made individual considerations. And I think it was really in stark contrast to Mr. Krasner's own testimony that he reviewed the applications only out of respect for the time put into preparing them. Right, and Mr. Listonby had no first-hand knowledge of that, and his testimony makes that clear, I think. But could a jury decide to believe otherwise, to believe that Mr. Listonby would have known had there been a change? Isn't that a credibility question? I don't think so. I think that Mr. Listonby had no first-hand knowledge, and DA Krasner testified and made clear at the time that he was not going to consider any request for religious exemption. And then, in addition to Mr. Listonby, we have the letter, right? I mean, regardless of Mr. Listonby's knowledge, we have the letter that Ms. Spivack received saying that her exemption request was denied because, essentially, her reasons weren't good enough. So that's also inconsistent with Mr. Krasner's testimony. So I guess what I'm getting at is it seems to me that there is a dispute of material facts as to which policy was in effect, and wouldn't that require a remand? I don't think so. I think that the explanation for that letter is adequate as a matter of law. But assume for the moment that there was a dispute as to material fact on that issue, there still would not be a dispute as to material fact on strict scrutiny. And the court did decide strict scrutiny on the record. It said that it would satisfy strict scrutiny, and I think that the record here is more than adequate to satisfy that. The purposes of the decision not to grant any religious exemptions, and to control COVID, certainly is a compelling interest. The Supreme Court held as much in the Roman Catholic versus Cuomo case, and it is narrowly tailored. And the reasons for the tailoring as implemented were the inadequacy of testing to accomplish that purpose, the inadequacy of masking to accomplish that purpose, and the inadequacy of contact tracing. But if we determined that there was a genuine dispute of material fact as to which policy was in place, that is, that a reasonable jury could determine it was still the August 21 policy, a policy that by its terms allows for individualized exercises of discretion, then doesn't that also necessarily mean that the application of the standard of review would also need to go to a jury? No, because under either standard, we've satisfied the standard. And there is no dispute as to Krasner's testimony that he did not consider individually any request for religious exemption. And there is no contrary testimony to that. If we accept that the January 2022 policy controls, where do we look for the contemporaneous statement about the justification for the new policy? Only to Krasner's testimony. And Krasner testified to the three elements that I've just mentioned, the inadequacy of testing, the inadequacy of masking, and the inadequacy of contact tracing. I think a few minutes ago you said that Mr. Krasner might have considered an accommodation, but not a religious exemption to the policy. Could you explain what the difference is? Well, the difference is he offered to settle a litigation. OK. I want to take us outside of the settlement realm. And I think contemporaneously with Ms. Spivak's request. So would he have offered a non-religious, religiously-based accommodation for remote work? The fact is that on the ground, when the decisions were made, no such accommodations were offered. And by the way, there is no Title VII claim and there is no claim for an accommodation here. And when the accommodation was offered, she rejected it. So I think those facts are indisputable. Then we get to whether hypothetically he might have found a place for a valued employee, apart from the issue of religion. And again, that's pure speculation. It was speculation on his part in his deposition. And it's unsupported by any facts. You agree the question for us is not whether he actually did make that such an accommodation, but whether he had the opportunity to under the policy as it existed at the time. The policy as it existed at the time was no religious exemptions. And the reason he might have speculated, the speculative reason that he might have tried to retain a valued employee has nothing to do with her religion. And it could have been that she just didn't trust the science. It could have been any one of a number of reasons. But if your argument is that as to any valued employee, he had the discretion to make the determination to allow for remote work. But in the case of a religious application, would not do so. Isn't that per se a problem for purposes of free exercise? If it actually were a fact, it might have been a problem. But it was not a fact. In fact, he did not retain any discretion at the time the decisions were made. With the exception of the discretion to study about 10 requests for medical exemptions, determining that one was well documented that it was life threatening to the individual and granting that one medical exemption. But other than that, there was no retained discretion. And again, his speculation about what he might have done under different circumstances is not evidence of the policy as it existed or as it was implemented. So a reasonable jury could certainly reach that conclusion. But with the testimony of both Mr. Listonby and also Ms. Madden, saying that the decision to even categorically deny the exemptions was not a new policy, that both of them seem to be saying this was an exercise of his discretion. And if a decision maker has the absolute discretion to decide that they are not going to consider these particular applications for exemption, or that they will, why doesn't that put us in the category of cases like Fulton, where we would be applying strict scrutiny to ensure that that discretion was not being exercised adversely to free exercise? I think, Your Honor, the question conflates the creation of policy with the implementation of policy. And the issue before this court and the issue before the district court was the implementation of policy. And this court, for example, in the Lighthouse case, I forget the rest of the name, but it's in the briefing, acknowledged that, yes, in that case, it was a zoning case where a church was not allowed in a redevelopment district. But what the court said there, yes, the city or the township, the authority, always has the ability to amend a policy. But that's not what we're going to examine here. What we're going to examine is, what was the policy as it existed, as it was implemented? And does that pass the level of scrutiny required? In that case, it was rational basis. And I think that's also the policy that applies here. But again, whichever policy, whichever level of scrutiny the court decides applies, I think the facts here well satisfy it. OK. OK. Thank you, Your Honor.  First, the medically exempt employee was an attorney who worked in court. That's reflected at 479 in the record, that she was public facing in court. Second, with respect to the defendant's argument that the plaintiff refused accommodations, the plaintiff refused a settlement offer, the record reflects that at the time she was denied an exemption request, she requested anything that she could get to save her job, including remote work. It's also worth noting that remote work is a less favorable accommodation than others received, and so it would still be discriminatory to provide her a less favorable accommodation than one afforded to other employees. And so in that sense, that wouldn't remedy the discrimination. Which other employees are you referencing? The medical employees and the unionized employees, either one. Additionally, the core issue with the Fulton discretion is whether the defendant possessed the authority, not how he used it or how he vowed never to use it. In Fulton, the commissioner said he would never use his power to grant an exemption, but the fact that the exemption authority existed was enough to make it strict scrutiny. The issue with respect to the distinction between policy and his policymaking authority, the reason why those appear conflated here is because of the way the defendant structured his policies. The way that he describes his policies, it's whatever he happens to cite at a particular time. And in his testimony about how he came to the decision to grant the particular medical exemption and to deny the religious exemption requests, it's all very individually focused, which reflects discretion. And if the policy's content is simply whatever he happens to think at the time, then that is a system of discretion. There's nothing that limited how he exercised his discretion at that time. But where are you pointing in the record? Because his testimony to this point seems to be that he was following what was being medically recommended, what the guidelines were that were evolving at the time, and based on his evolving understanding of his own legal authority. The record is particularly 287 to 288, as well as 278 to 79. He discusses why he found the medical application to be particularly persuasive. And he specifically refused to articulate any overarching criteria that governed how eligibility would be determined. He pointed to what he found persuasive in individual cases to provide examples that explained his reasoning, but he didn't articulate any criteria in writing or otherwise that would limit his authority to consider other alternatives. Why doesn't that just reinforce the notion that he had adopted what was a categorical policy as to any exemption other than a medical one, and even then with a very high threshold? It reinforces that he has the discretion to consider an exemption for any reason he finds to be persuasive. What he ultimately found to be persuasive is not relevant to the question of whether he had the authority to consider an exemption for whatever reason that he found persuasive. If a decision maker has discretion to adopt categorical rules, categorical policies, the fact that they have that discretion doesn't necessarily implicate Fulton if they are using that sort of self-imposed restraint, right? Yes. The question isn't, you're not saying that we should be just looking to whether he had discretion to adopt a categorical policy. No, that's not our argument. Our argument is that he had the, it's not his ability to change policy, it's the policy he actually set, which is one that reflects a great deal of discretion because there isn't any criteria that really cabined his decision at the outset. And that contrasts with the kinds of cases such as Fellowship of Christian Athletes, or rather it's similar to Fellowship of Christian Athletes, which was a case where the decision makers were exercising common sense. And common sense is not a generally applicable policy, even though it may make sense. We're not looking for arbitrariness in his decisions. But why isn't the policy on which he settled, at least as of January, no individual exemptions other than medical with a very high threshold? Well, that does trigger strict scrutiny if it's categorical anyway, but that isn't the way he chose to decide those exemption requests. Does not change the fact that he had discretion to consider them for any reason. And if he had promulgated a policy with objectively defined pre-existing criteria that determined when someone was eligible and when someone was not, then that would be a categorical policy. But he did not do that. In his testimony, he specifically discusses it in terms of the individual situation and emphasizes that every exemption would be, the factors considered would be determined based on the individual's circumstance. And that is very different than the kinds of, even such as the city's policy, where there's a slate of eligibility requirements that then someone can say, this one qualifies, this one doesn't. The defendant's testimony instead is very individually based and does not articulate criteria. My understanding is that the January 22 policy was, if we credit Mr. religious exemptions, and he would consider medical exemptions on a case-by-case basis. And is that where you're saying that he had individual discretion because we should, because those are comparable requests for, you know, and comparable people made them. And therefore, if he could consider medical exemptions, sorry, can you just kind of unpack this for me? Of course, no, that's not the, the comparability goes to a different way of triggering strict scrutiny. So the ability to consider the medical would be more towards the, he's providing better treatment for similarly situated secular conduct than it is to discretion. The discretion was more to his understanding that he had the sole discretion to consider any exemption request, which is reflected in his testimony at the site of 301, where he discusses what he would have considered at the time. And it demonstrates that he had the authority to grant exemptions that were not otherwise contemplated under what he ultimately articulated as his policy. For, if the court has no further questions. Thank you. All right, we thank both counsel for their very helpful briefing and argument in this important case. And we will take the case under review.